UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------
                                                :
CONTINENTAL CASUALTY CO.                        :
                                                :        CASE NO. 1:08-CV-1410
            Plaintiff,                          :
                                                :
vs.                                             :        OPINION & ORDER
                                                :        [Resolving Doc. Nos. 18, 22 & 23.]
HONEYWELL INTERNATIONAL, INC.                   :
                                                :
            Defendant.                          :
                                                :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        Defendant Honeywell International, Inc. ("Honeywell") moves for summary judgment in this

diversity action. [Doc. 18.]  Plaintiff Continental Casualty Company ("Continental") opposes this

motion. [Doc. 22.]  For the following reasons, the Court **GRANTS** the Defendant's motion.

## I.  Background

        Plaintiff Continental, acting as a subrogee (insurer) of the Albert H. Higley Company

("Higley") and as an assignee of Southwest General Health Center ("Southwest"), sued Defendant

Honeywell after Honeywell allegedly breached the warranty it issued for its roof system ("the

"Warranty") by refusing to pay for the repair or the replacement of the roof system after it began to

fail in several respects.  With its Complaint, Plaintiff Continental alleged the following claims against

Defendant Honeywell: (1) breach of express warranty; (2) breach of warranty (third party

beneficiary); (3) promissory estoppel; (4) negligent misrepresentation; and (5) fraud. [Doc. 1, Ex. A

at 7-8.]

        On December 1, 1997, Southwest entered into a general contract agreement with Higley for

Case No. 1:08-CV-1410
Gwin, J.

the purposes of building a multi-purpose health and wellness facility called LifeWorks in Middleburg

Heights, Ohio ("LifeWorks"). [Doc. 18, Ex. A at 29.]  Higley, in turn, entered into a subcontract with

the Weather Mark Corporation ("Weather Mark") for the installation of the roof of the LifeWorks

building. [*Id.* at 30.]

    Weather Mark installed a roof system[1] manufactured by Defendant Honeywell[2] in the

LifeWorks building. [Doc. 18, Ex. F.]  According to Plaintiff Continental, the roof system started

leaking soon after Weather Mark completed the installation.  [Doc. 22, Ex. 9 at 2.] Eventually, the

leakage became so widespread that the roof system was replaced.  [Doc. 18, Ex. A at 8.]

    Plaintiff Continental admits that the roof installer, Weather Mark, was negligent in installing

Honeywell's roof system in the LifeWorks facility.  [Doc. 18, Ex. A at 42-43; *see also* Doc. 18, Ex.

B. at 21.] Further, Plaintiff Continental admits that the roof system was not installed in accordance

with Defendant Honeywell's plans and specifications.[3]  [Doc. 18, Ex. A at 34; *see also* Doc. 18, Ex.

---

[1] Weather Mark installed a coal-tar roofing system in the LifeWorks facility. [Doc. 22, Ex. 52 at 25, 29.]
Honeywell's Black Armor Coal Tar roofing and waterproofing pitches "are derived from base tars extracted from
bituminous coal during the coking process. A variety of feedstocks are then blended and distilled to achieve the proper
specification, physical properties and performance characteristics.  The thermal treatment during the coking and
distillation process produces a material with a unique chemistry." [Doc. 18, Ex. G at 4.] The molecular structure of
the roofing pitch "provides an inherent resistance to water, air, vapor penetration, and most chemicals encountered
in today[']s environment. Because of its unique coldflow characteristics, Black Armor roofing pitch can self-heal small
fractures before more serious damage can occur." [*Id.* at 3.] According to Honeywell's specifications for installing coal-
tar roofing systems, "when acoustical decks are used to reduce the potential for bitumen drippage, the roofing system
must include a dry sheet on the deck and the first ply of the membrane system must be a base sheet set in steep
asphalt." [*Id.* at 5.] Further, according to Honeywell's specifications, all "decks must be covered by at least one layer
of mechanically attached insulation. Subsequent layers are to be installed in hot asphalt with joints staggered from the
preceding layer by the maximum distance possible."  [*Id.* at 15.]

[2] AlliedSignal, Inc. was the original manufacturer of the roof system, but this company subsequently merged
with Honeywell and will be referred to as Honeywell from this point forward.

[3] For instance, the joints of the cover boards on the roof were not taped, [Doc. 18, Ex. B at 16], the installation
of the built-up roofing membrane was not done in the presence of the roofing system manufacturer's technical
personnel, [*id.*], and the ply felts were not installed pursuant to Honeywell's instructions, [*id.* at 17; *see also* Doc. 22,
Ex. 52 at 31.]

-2-

Case No. 1:08-CV-1410
Gwin, J.

B at 6, 15.]  Higley, the builder of the LifeWorks facility, also admits that it failed to follow numerous requirements set out in the construction documents that involved monitoring its roof installer, Weather Mark, during the installation of the roof system.  [Doc. 18, Ex. B at 9, 11, 13-21; *see also* Doc. 22, Ex. 52 at 30, 32.]

Nevertheless, Plaintiff Continental seeks to hold Defendant Honeywell liable for the cost of the replacement of the roof system.  Among other issues, the parties disagree regarding whether the Warranty issued by Defendant Honeywell covers the replacement in question.  Specifically, Plaintiff Continental disagrees with Honeywell's contention that the Warranty only covers the repair or replacement of the roof system due to water leaks, as opposed to bitumen leaks or moisture damage caused by condensation.  To explain the parties' arguments, it is necessary to first set out the terms and conditions of the Warranty and then to describe the events leading up to Southwest's replacement of the Honeywell-manufactured roof system.

*A. Warranty Terms and Conditions*

On March 22, 1999, Defendant Honeywell issued the Warranty for its roof system to Southwest.[4]  [Doc. 18, Ex. F at. 2-3.] In the Warranty, Honeywell agreed that, when the roof system in question was installed in accordance with its specifications and details, it would repair the roof system at its expense to the extent necessary to return it to a *watertight condition* for a period of twenty years from the listed completion date of the installation (February 14, 1999).  [*Id.* at 2.]

Under the specific terms of the Warranty, Honeywell is required to repair leaks caused by: (1) defects in workmanship or ordinary wear and tear of the roofing membrane and the approved base

---

[4] As a precondition for issuing the Warranty, Honeywell required that (1) a Honeywell-certified subcontractor be used to install the roof; and (2) Honeywell's chosen inspector approve the roof installation.  [Doc. 22, Ex. 10.] Previously, Honeywell had entered into a contract with Weather Mark designating Weather Mark to be an authorized installer of materials sold or distributed by Honeywell. [Doc. 18, Ex. D.]

Case No. 1:08-CV-1410
Gwin, J.

flashing; (2) blisters, bare spots, fishmouths, wrinkles, ridges, and splits in the built-up roofing

membrane or base flashing not caused by structural movement or failures; or (3) deterioration of the

membrane caused by standing water. [Doc. 18, Ex. F at. 2.]

Pursuant to the Warranty, Defendant Honeywell is not required to repair leaks caused by: (1)

natural disasters, including but not limited to floods, lightening, hail, earthquakes, gales, etc.; (2)

structural movement or failure or movement of any material underlying the roofing membrane and

base flashing; (3) acts of negligence, abuse, misuse, and vandalism; (4) infiltration or condensation

of moisture in, through, or around walls, copings, rooftop equipment, building structures, and

underlying or surrounding materials; (5) modifications of the roof which were made without

Honeywell's prior approval or failure of the building owner to make repairs not covered under this

Warranty; (6) repair work by any contractor other than a Honeywell authorized contractor or use of

unapproved material; (7) traffic and or storage of materials on the roof or failure to remove debris

from the roof; or (8) material supplied or manufactured by others, unless otherwise approved. [*Id.*

at 3.] Honeywell's catalogs and Sweets Catalog[5/] also specify that Honeywell is not responsible for

"improperly designed deck systems, bitumen drippage, [and] migration or membrane slippage." [Doc.

18, Ex. G at 5; *see also* Doc. 18, Ex. A at 17.]

*B. Events Leading Up to the Roof System Replacement*

After Weather Mark agreed to install the roof system manufactured by Defendant Honeywell

in the LifeWorks facility, on November 11, 1998, Honeywell engaged Construction Resources, Inc.

---

[5/]The Sweets Catalog is a publicly-available "broad and general and large volume of information" dealing "with a multiple of [Honeywell] roofing systems." [Doc. 18, Ex. A at 50.] Higley had the Sweets Catalog at its offices. [*Id.*]

-4-

Case No. 1:08-CV-1410
Gwin, J.

("Construction Resources") to conduct three audits of Weather Mark's roof installation.[6/] [Doc. 22, Ex. 44 at 3.] The next day, Weather Mark informed Construction Resources that the roof system was completely installed except for the sheet metal. [Doc. 22, Ex. 9 at 2; *see also* Doc. 18, Ex. A at 36-37; Doc. 22, Ex. 52 at 7.] As a result, Construction Resources was only able to conduct one interim audit on November 17, 1998 and one punch list audit on February 22, 1999. [*Id.*; *see also* Doc. 18, Ex. A at 5; Doc. 22, Ex. 44 at 4-11; Doc. 22, Ex. 52 at 21.] Construction Resources did not notice any major problems with the roof system during either visit, but its report noted that this was likely due to the fact that the roof was nearly completed prior to the first audit. [Doc. 22, Ex. 9 at 2; *see also* Doc. 22, Ex. 52 at 8, 10.]

Plaintiff Continental alleges that the roof system manufactured by Defendant Honeywell began leaking soon after it was installed. The roof was first repaired due to a leak on March 25, 2004, however. [Doc. 22, Ex. 21 at 2-4.] This leak – and the resulting repair – was apparently covered by the Warranty, as Honeywell approved the cost of the repair. [*Id.* at 2; *see also* Doc. 22, Ex. 52 at 19.]

On August 20, 2004, Southwest notified Defendant Honeywell via facsimile that there were four bitumen or coal tar leaks in the roof system of the LifeWorks facility. [Doc. 22, Ex. 23 at 2; *see also* Doc. 22, Ex. 25 at 2.] Honeywell acknowledged the receipt of Southwest's letter and claimed that the Warranty covering the roof system was a "leak warranty," meaning that it obligated Honeywell to return the roof to a watertight condition should a leak occur, but that it did not cover bitumen migration. [Doc. 23, Ex. D at 2.] Honeywell also recommended that Southwest employ

---

[6/]These inspections were solely for Honeywell's benefit and were designed to help Honeywell determine whether it could issue a Warranty for the roof system. [Doc. 18, Ex. A at 22, 27.] According to the terms of the Warranty application, however, the authorized contractor was obligated to notify Honeywell "of the exact date when roofing work will begin . . . . [not fewer] than 14 days before [the] date of such beginning." [Doc. 18, Ex. E at 3.]

Case No. 1:08-CV-1410
Gwin, J.

Construction Resources to determine whether the roof system had been properly installed; according

to Honeywell, proper roof installation would have prevented coal tar migration. [*Id.*]

On September 1, 2004, Bud Griffith of Construction Resources visited LifeWorks and

conducted a visual audit of the problems that Southwest was experiencing with the Honeywell-

manufactured roof system.  [Doc. 22, Ex. 47 at 2.] According to Griffith's assessment, "[b]itumen

drippage to the interior of the building, in acoustical deck areas, appear[s] to be randomly occurring

throughout the building.  This reportedly has been ongoing since the first year after completion of the

project. [Weather Mark] has installed catch pans in the past but the phenomenon continues to grow."

[*Id.*] Griffith stated that Southwest had reported "that water dripping occurs in the colder weather

months in the natatorium.  Signs of a possible problem with the vapor retardant installation appear

evident." [*Id.* at 5.]

Southwest had indicated that there were active leaks in six locations, [*id.* at 6], and Griffith

found several issues during the visual inspection that may have contributed to the leaks: (1) water

potentially existing behind the flashing, [*id.* at 8]; (2) a split in the lower elevation roof area that

Weather Mark had reportedly repaired with roof cement and fabric a few weeks prior to the

inspection, [*id.* at 9]; (3) "numerous ridges that were manifesting through both the upper and lower

roof areas," [*id.*]; (4) "a lack of termination bars and/or a lack of counterflashing throughout the roof

areas," [*id.* at 12]; and (5) birds reportedly poking holes in the exterior installation finish system

("EIFS"), [*id.* at 13.]

At the conclusion of the September 1, 2004 visit, Southwest asked Construction Resources

to provide it with a proposal regarding an independent investigation of the roof system and the

problems identified in the course of the visual inspection. [Doc. 22, Ex. 9 at 2.] On October 13, 2004,

Case No. 1:08-CV-1410
Gwin, J.

Griffith conducted a field investigation of the roof system on behalf of Southwest. [*Id.*] Construction

Resources also employed Willham Roofing ("Willham") to assist in opening the roof system and in

repairing the destructive tests. [*Id.*]

As a result of this investigation, Construction resources found that Weather Mark, the roofer,

had negligently installed the roof.  Specifically, Weather Mark failed to follow Defendant Honeywell's

design and manufacturer guidelines for installing the roof by neglecting to place a dry sheet on the

deck under the insulation and a base sheet installed in steep asphalt over the acoustical metal decking

as the first ply of the roof membrane.  As a result, the coal tar or bitumen used as part of the installed

roofing system to secure the layers of the roofing membrane and to adhere the membrane to the roof

insulation seeped through the perforated (and improperly uncovered) holes in the acoustical  metal

decking.  [*Id.* at 6; *see also* Doc. 18, Ex. A at 6; Doc. 22, Ex. 52 at 5-7, 8-9, 13.] The absence of the

dry sheet and the base sheet, in combination with other factors, meant that there was nothing to

prevent the coal tar from reaching the acoustical metal deck and dripping through the holes in the

acoustical deck and into the LifeWorks facility.

Further, Griffith discovered during the inspection of the roof system that a ridge in the roof

membrane appeared to have "risen up off the perlite receiver board."  [*Id.* at 8.]  This finding

suggested that a "fishmouth occurred in the installation of the fiberglass felt reinforcement during

membrane application and that it was not repaired by the crew as they continued membrane

application." [*Id.*] As a result, "[t]he coal tar bitumen appear[ed] to have flowed through the

fiberglass in the raised ridge and ponded on the perlite board below . . . . It [was] likely that moisture

[would] be able to pass through the fiberglass felts once sufficient coal tar ha[d] flowed through to

the perlite board." [*Id.*] Griffith also reported that bitumen drippage and water entry (occurring in

Case No. 1:08-CV-1410
Gwin, J.

cooler weather) at the west wall of the natatorium area likely resulted from "improper vapor retardant installation," [*id.* at 13], and from the "30 pound enveloping ply being torn at the point of the core," [*id.* at 14.]

> Upon completion of the field inspection, Griffith concluded that the
>
> bitumen drippage into the building and resulting leaks that have apparently begun and that will most likely continue from the loss of waterproofing; the ridging phenomenon and the bitumen flow that results through the fiberglass felts that apparently have and will most likely continue to allow water entry  into the building; the moisture manifesting in the insulation around the natatorium that causes a loss in insulating value and that drips back into the building in cooler temperatures; all result in the need to replace the roof system . . . . Given that the bitumen entry points reportedly number 100 different locations, it may be more practical to just replace the deck during the roof replacement project.

[*Id.* at 21.] According to Griffith, the cost for replacing the roof system would be $1,300,000.00 and $1,900,000.00 if deck replacement was included in the scope of the work. [*Id.*]

In April 2005, Southwest complained that there was a water leak in the roof system of the LifeWorks building. [Doc. 18, Ex. A at 26.] This was Southwest's second complaint regarding water leakage, as opposed to bitumen drippage or condensation (it first complained about a water leak in March 2004). [*Id.*]  On April 26, 2005, Defendant Honeywell authorized Willham to proceed with the repair of water leaks as covered by the Warranty, stipulating that the cost of the repair was not to exceed $1,000.  [Doc. 22, Ex. 30 at 2; *see also* Doc. 18, Ex. A at 54.]  Willham repaired the water leak in the roofing system on July 25, 2005 and Honeywell covered the cost of this repair.  [Doc. 22, Ex. 31 at 2.]

On May 5, 2005, Construction Resources and Advanced Marketing Group ("Advanced Marketing") conducted an infrared moisture survey of the roof system in the LifeWorks facility to determine whether there was water leakage into the roof system insulation that was caused by an

-8-

Case No. 1:08-CV-1410
Gwin, J.

early failure of the roof membrane.[7/] [Doc. 22, Ex. 49 at 3.] The survey revealed that there were ten to twenty locations that had moisture-damaged insulation and that sections of the roof were beginning to fail prematurely. [*Id.* at 4.] The survey recommended that a more detailed investigation of the roof system be conducted. [*Id.*]

A follow-up survey was conducted on July 2, 2005. [Doc. 22, Ex. 50 at 2.] This survey revealed that there were approximately eleven locations throughout the roof system that appeared to be water-damaged. [*Id.*] "The moisture appeared to be from the flashing details. Most of the moisture damage was concentrated at the perimeter of the natatorium roof section's exterior walls. There were, however, a number of other leak locations, each of which was located near a roof flashing detail." [*Id.*] Construction Resources and Advanced Marketing returned to the LifeWorks facility on July 8, 2005 to observe core cut testing undertaken by Willham and to confirm their findings. [*Id.*] The core testing revealed additional traces of water "around the perimeter of the natatorium roof on the exterior walls. These regions were found at the base of the wall flashings . . . . They were thermally hidden . . . under the heavy flood coat of gravel and tar at the roof edge . . . . [and they were] probably caused [by] poor installation . . . ." [*Id.*]

In late 2005, Southwest replaced the roof system manufactured by Defendant Honeywell in accordance with the October 2004 recommendations made by Bud Griffith of Construction Resources. [Doc. 18, Ex. A at 8.]

On December 1, 2008, Defendant Honeywell filed a motion for summary judgment, seeking

---

[7/] The parties' briefs do not explain why this survey or the subsequent July 2005 survey were conducted or on whose behalf they were conducted. It is likely, however, that they were conducted for the benefit of Southwest and constituted additional investigations, beyond those performed in September and October 2004, into the cause of the failure of the roof system at LifeWorks. Further, they likely aided in Southwest's (and Defendant Honeywell's) determination of whether the roof could be repaired or whether it had to be totally replaced.

Case No. 1:08-CV-1410
Gwin, J.

a determination that the Warranty was voided by Weather Mark's failure to install Honeywell's roofing system in accordance with Honeywell's specifications and details or, alternatively, that Plaintiff Continental has no valid claim under the Warranty because Defendant Honeywell had corrected the few earlier water leaks in the roof and the roof remained watertight prior to its removal. [Doc. 18 at 1.] Defendant Honeywell also asked the Court to grant summary judgment in its favor on Plaintiff Continental's promissory estoppel, negligent misrepresentation, and fraud claims, arguing that Continental could not demonstrate that Honeywell ever made any representations that would support these claims. [*Id.* at 1-2.]

Plaintiff Continental opposed Defendant Honeywell's motion for summary judgment on December 18, 2008, arguing that factual questions existed as to the following matters: (1) whether Honeywell waived the "pre-condition" that the roof must be installed in accordance with its specifications; (2) whether the roof failure in this case is covered under Honeywell's Warranty; (3) if the Warranty is to be interpreted as asserted by Honeywell, whether it is illusory and must be enforced in accordance with how a reasonable owner would interpret it; and (4) even if, as Honeywell asserts, the Warranty only insures "watertightness," whether the roof system was and would continue to stay watertight. [Doc. 22 at 1-2.] Defendant Honeywell replied in support of its motion for summary judgment on December 31, 2008. [Doc. 23.]  For the following reasons, the Court **GRANTS** the Defendant's motion.

## II. Legal Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56©.  The moving party has the initial burden of showing the absence of a genuine

Case No. 1:08-CV-1410
Gwin, J.

issue of material fact as to an essential element of the non-moving party's case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  "A fact is material if its resolution will affect the outcome of the lawsuit."  *Martingale, LLC v. City of Louisville,* 361 F.3d 297, 301 (6th Cir. 2004) (citing *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986))).

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323 (quoting FED. R. CIV. P. 56©).  However, the moving party is under no "express or implied" duty to "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts.  *See id.* at 586.  Nor can the nonmoving party rely upon the mere allegations or denials of its pleadings. FED. R. CIV. P. 56(e).

In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party.  *Thomas v. Cohen,* 453 F.3d 657, 660 (6th Cir. 2004) (citations omitted).  "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities*

-11-

Case No. 1:08-CV-1410
Gwin, J.

*Serv. Co.,* 391 U.S. 253, 288-89 (1968)).  Ultimately the Court must decide "whether the evidence

presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."  *Martingale,* 361 F.3d at 301 (citing *Terry Barr Sales Agency,*

*Inc. v. All-Lock Co., Inc.,* 96 F.3d 174, 178 (6th Cir. 1996)) (internal quotations omitted).

### III. Analysis

In its motion for summary judgment, Defendant Honeywell argues that it is entitled to

judgment as a matter of law as to the following claims made by Plaintiff Continental:  (1) breach of

express warranty; (2) breach of warranty (third party beneficiary); (3) promissory estoppel; (4)

negligent misrepresentation; and (5) fraud.  [Docs. 18, 23.]  The Court considers all of the

Defendant's arguments below, discussing the breach of warranty (third party beneficiary) argument

first, as it relates to standing.

*A. Breach of Warranty (Third-Party Beneficiary)*

In its Complaint, Plaintiff Continental argues that Higley, the builder of the LifeWorks facility,

is a third-party beneficiary to the Warranty and, as Higley's insurer, Continental is subrogated to

Higley's rights as a third-party beneficiary. [Doc. 1 at 7.] Defendant Honeywell contends that Higley

is not a third-party beneficiary to the Warranty under New Jersey law and, therefore, neither Higley

nor Continental can sue to enforce the Warranty.  The Court agrees with the Defendant and finds that

even if Continental prevails on the breach of Warranty claim against Honeywell, it cannot sue to

enforce the Warranty.

Under New Jersey law – the law governing the Warranty – courts "have been hesitant to

imply a third-party beneficiary obligation without an explicit indication by the parties that not only

is the claimant an incidental beneficiary of the proposed arrangement, but also that it will have a direct

-12-

Case No. 1:08-CV-1410
Gwin, J.

claim under the contract." *Dravo Corp. v. Robert B. Kerris, Inc.*, 655 F.2d 503, 510 (3d Cir. 1981).

In determining whether "a person qualifies as a third-party beneficiary, the test is 'whether the

contracting parties intended that a third party should receive a benefit which might be enforced in the

courts . . . .'" *Werrmann v. Aratusa, Ltd.*, 630 A.2d 302, 305 (N.J. Super. Ct. 1993) (citations

omitted).  "A person who is not a party to a contract but who merely benefits from the contract can

not sue to enforce the contract solely because they may benefit from the contract." *Parkway Ins. Co.

v. N.J. Neck & Back*, 748 A.2d 1221, 1229 (N.J. Super. Ct. 1998).

In this case, Higley, Plaintiff Continental's insured, is not named in the Warranty.  Indeed, the

Warranty states that it is issued to the "above named Building Owner," or Southwest – the owner of

the LifeWorks facility. [Doc. 18, Ex. F at 2.] The Warranty contemplates that its benefits would be

transferrable only to a subsequent building owner and only if certain requirements are met. [*Id.* at 3.]

Further, Charles Stephenson, the president and chief operating officer of Higley, has admitted that

the Warranty was only issued to Southwest and not "to Higley, not to Weather Mark, [and] not to

anyone [else] . . . ." [Doc. 18, Ex. A at 55.] Thus, Higley is not a third-party beneficiary to the

Warranty and Continental, as Higley's insurer, cannot sue Honeywell to enforce the Warranty even

if the Warranty is not void.

## B.  Breach of Express Warranty

With its motion for summary judgment, Defendant Honeywell says that Plaintiff Continental's

breach of express warranty claim fails as a matter of law because the roof system manufactured by

Honeywell was not installed in accordance with Honeywell's specifications and, at the time the roof

was replaced, it was watertight.  [Doc. 18 at 10-12.] The Plaintiff contends that Honeywell waived

its argument regarding the faulty installation of the roof system by issuing the Warranty after

Case No. 1:08-CV-1410
Gwin, J.

inspecting the roof and by covering other repairs to the roof pursuant to the Warranty.  Doc. 22 at
7-9.]  Further, the Plaintiff argues that the roof failure in this case is covered under any reasonable
interpretation of the Warranty terms. [*Id.* at 11-12.] The Court agrees with the Defendant.

A threshold issue is what state's law governs the Warranty, which includes a choice of law
provision calling for the application of New Jersey law.  The parties agree that, in accordance with
the language of the Warranty, substantive New Jersey law governs the interpretation of the terms of
the Warranty, [Doc. 18, Ex. F at 3], and that all other issues should be decided with reference to Ohio
law, [Doc. 18 at 9; Doc. 22 at 6.]

The Sixth Circuit has held that "a federal court whose jurisdiction is based on diversity of
citizenship must apply the conflict of law rules of the forum state." *Johnson v. Ventra Group, Inc.,*
191 F.3d 732, 738 (6th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490
(1941)). Therefore, Ohio's conflict of law rules govern this case.  Under Ohio law, a choice of law
"clause contained in an agreement in connection with an arm's length . . . transaction between two
business entities is valid and enforceable . . . . , absent a strong showing that it should be set aside."
*Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006).  Because the
parties do not attempt to make any showing that the choice of law provision in the Warranty should
be set aside, the Court finds that the terms and conditions of the Warranty will be governed by New
Jersey law.

In New Jersey, "contract interpretation is usually a question of law.  *SmithKline Beecham*
*Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 159 (3d Cir. 1996) (citations omitted).  Under New Jersey
law, courts should interpret a contract considering "the objective intent manifested in the language
of the contract in light of the circumstances surrounding the transaction." *Id.* (citations omitted); *see*

-14-

Case No. 1:08-CV-1410
Gwin, J.

*also N.J. Dep't of Corr. v. Int'l Fed'n of Prof'l & Technical Eng'rs Local 195*, 780 A.2d 525, 536 (N.J. 2001) (holding that, under New Jersey law, the parties' intent is best evidenced by the language of the contract).

Courts cannot seek out ambiguities in the contract where none exist and are obligated to reject interpretations of contracts that are contrary to the clear terms expressed in the agreement. *See M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002) ("An ambiguity in a contract exists only if the terms of the contract are susceptible to at least two reasonable alternative interpretations."). Pursuant to New Jersey law, courts may, however, look to extrinsic evidence even when the contract is, on its face, free from ambiguity. *See Am. Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 182 (3d Cir. 1995); *Atl. N. Airlines, Inc. v. Schwimmer*, 96 A.2d 652, 656 (N.J. 1953). Extrinsic evidence, in this context, includes "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Id.* at 181 (citing *Teamsters Indus. Employee Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993)). Although courts are permitted to consider extrinsic evidence because the meaning of contractual terms "can depend on context. . . . the focus must remain on the language chosen by the parties, and a text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence . . . might cause a reasonable fact finder to understand the text differently." *Id.* at 181-82 (citations omitted). Thus, while extrinsic evidence can be used "to aid in ascertaining the intent of the parties, even when the terms of the instrument are otherwise unambiguous," *id.* at 182, it cannot be used "'for the purpose of modifying or enlarging or curtailing' the terms of the contract," *id.* (citations omitted).

In this case, the first paragraph of the Warranty states

Case No. 1:08-CV-1410
Gwin, J.

> that, *when the above specified roofing system is installed in accordance with current [Honeywell] specifications and details*, [Honeywell], subject to the conditions contained herein, for a period of 20 years from the Completion Date stated above, will at its expense, repair or cause to be repaired the Roofing System described in this Warranty to the extent necessary to return the Roof System to a watertight condition.

[Doc. 18, Ex. F at 2.] (emphasis added.)  The Supreme Court has held that a manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 525 (1992).  Further, the parties in this case do not dispute the fact that Weather Mark installed the roof system manufactured by Honeywell in a negligent manner, [Doc. 18, Ex. A at 42-43; *see also* Doc. 18, Ex. B. at 21], and not in accordance with Honeywell's plans and specifications, [Doc. 18, Ex. A at 34; *see also* Doc. 18, Ex. B at 6, 15.] Therefore, it appears that the Warranty is void.

Defendant Honeywell can rely on the abovementioned Warranty condition in refusing to reimburse Plaintiff Continental for the replacement of the roof system at the LifeWorks facility because, contrary to Continental's argument, Honeywell has not waived this condition through its conduct.  Performance of a contract condition may be excused by waiver.  *Mayer v. Dev. Corp. of Am.*, 541 F. Supp. 828, 855 (D.N.J. 1981).  Waiver is defined as "the voluntary and intentional relinquishment of a known right." *Id.* at 856 (citations omitted).  Described in greater detail, waiver is

> the voluntary act of the party and does not require or depend upon a new contract, new consideration or an estoppel. It cannot be recalled or expunged . . . A waiver may be either verbal or in writing; and it is not necessary that the waiver should be direct and positive. It may result from implication and usage, or from any understanding between the parties which is of a character to satisfy the mind that a waiver is intended. The assent must, however, be clearly established and will not be inferred from doubtful or equivocal acts or language.

*Id.* (citations omitted).  According to New Jersey law, "if the benefit of a provision in a contract is

-16-

Case No. 1:08-CV-1410
Gwin, J.

waived compliance therewith is excused and the party waiving it cannot thereafter insist on its

performance." *Van Dusen Aircraft Supplies v. Terminal Constr. Corp.*, 70 A.2d 65, 67 (N.J. 1950).

It is true that Honeywell neglected to take any substantial steps to ensure that Weather Mark,

the roof contractor, installed the roof in accordance with Honeywell's specifications and details.

Even though Construction Resources informed Honeywell that the roof was essentially installed

before Construction Resources could conduct any audit of the installation process, [Doc. 22, Ex. 9

at 2; *see also* Doc. 18, Ex. A at 36-37; Doc. 22, Ex. 52 at 7], Honeywell did not (1) refuse to issue

the Warranty; (2) review its details and specifications with Weather Mark and obtain assurances that

they had been followed; or (3) take core samples to confirm Weather Mark's adherence to its details

and specifications. [Doc. 22, Ex. 52 at 16, 23, 25, 26.] Instead, Honeywell proceeded to issue the

Warranty for its roof system to Southwest, the owner of the LifeWorks facility.  Honeywell has also

consistently honored its obligations under the Warranty by authorizing and reimbursing the repair of

at least two roof leaks in 2004 and 2005.  [Doc. 22, Ex. 21 at 2; Doc. 22, Ex. 31 at 2; *see also* Doc.

22, Ex. 52 at 19.]

Despite its conduct, Honeywell has not demonstrated that it has waived the benefit of the

Warranty provision conditioning Honeywell's obligations to Southwest on the proper installation of

the roof system.  Honeywell has not assented to waiving this provision, either verbally or in writing.

Moreover, neither Honeywell's failure to confirm the quality of the installation for its own benefit

nor Honeywell's previous authorization of reimbursement for prior repairs of minor water leaks in

the roof system installed in the LifeWorks facility unequivocally demonstrate that it has intended to

waive, and indeed has waived, the benefit of this Warranty provision.

Further, contrary to Plaintiff Continental's argument, even if the Warranty is not void due to

-17-

Case No. 1:08-CV-1410
Gwin, J.

Weather Mark's negligent installation of Defendant Honeywell's roof system, the Warranty does not cover the type of roof failure involved in this case. Honeywell contends that, under the Warranty, it is not responsible for repairing "leaks" resulting from condensation or from bitumen drippage – the leaks that caused the roof replacement in this case. Continental, on the other hand, argues that the Warranty covers all leaks, not just water leaks, and that the roof was not "watertight" at the time of its removal, thereby necessitating repairs covered under the Warranty. The Court agrees with the Defendant.

The Warranty specifically states that Honeywell is not required to repair leaks caused by "infiltration or condensation of moisture in, through, or around walls, copings, rooftop equipment, building structures, and underlying or surrounding materials." [Doc. 18, Ex. F at 3.] Moreover, Honeywell's catalogs and Sweets Catalog also specify that Honeywell is not responsible for "improperly designed deck systems, bitumen drippage, [and] migration or membrane slippage." [Doc. 18, Ex. G at 5; *see also* Doc. 18, Ex. A at 17.] The Warranty does state that, "when the [Honeywell] roofing system is installed in accordance with current [Honeywell] specifications and details, [Honeywell] . . . will at its expense, repair or cause to be repaired the Roofing System described in this Warranty to the extent necessary to return the Roof System to a *watertight condition*." [Doc. 18, Ex. F at 2 (emphasis added).]

Several courts have held that the term "watertight," as applied to a roof system, means that the roof system does not permit the passage of *water or moisture*. *See Prima Prods. v. FTC*, 209 F.2d 405, 407 (2d Cir. 1954); *Ferguson v. DRG/Colony N., Ltd.*, 764 S.W.2d 874, 882 (Tex. Ct. App. 1989) (holding that the term "watertight" generally means "constructed so that water cannot enter" and indicating that, specifically in the context of residential roof systems, this term means that

-18-

Case No. 1:08-CV-1410
Gwin, J.

the roof was put in a condition in which it "did not leak when it rained").

The Supreme Court of New York, Dutchess County, has also considered the meaning of the term "watertight," as applied to the Warranty issued by Honeywell for its roof systems, in *Arlington Central School District v. Horizon Roofing and Sheet Metal, Inc*. The *Arlington* court adopted the definition of "watertight" set forth in the Merriam-Wesbter Dictionary – "of such tight construction or fit as to be impermeable to water except when under sufficient pressure to produce structural discontinuity." [Doc. 18, Ex. H at 4.] In light of this definition and pursuant to the plain language of the Warranty, the court in *Arlington* held that the Warranty "does not apply to . . . dripping tar" and dismissed the plaintiff's breach of warranty claim against Honeywell for Honeywell's failure to repair bitumen leaks resulting in tar drippage onto the plaintiff's gymnasium floor. [*Id.* at 3-4.]

In this case, the Honeywell-manufactured roof system in the LifeWorks building was replaced due to damage from condensation resulting from the improper installation of the roof system by Weather Mark. [Doc. 18, Ex. A at 8.] Numerous bitumen or coal tar leaks that were also caused by the improper installation of the roof system also necessitated the replacement of the roof system. [*Id.*] The Warranty states that Defendant Honeywell is not responsible for repairs caused by these issues. Additionally, there is no indication that there were actual water leaks in the roof system at the time of its removal, thereby making it non-"watertight" and requiring Honeywell to repair the roof at its own expense. [*Id.*] Indeed, Honeywell had previously paid for the repair of several minor water leaks in the roof system. [Doc. 22, Ex. 30 at 2; *see also* Doc. 18, Ex. A at 54.] Thus, even if the Warranty is not rendered void by Weather Mark's negligent installation of the roof system, Honeywell is not obligated to cover the costs of the roof replacement pursuant to the terms of the Warranty.

-19-

Case No. 1:08-CV-1410
Gwin, J.

*C. Promissory Estoppel, Negligent Misrepresentation, and Fraud*

In its Complaint, Plaintiff Continental asserts claims of promissory estoppel, negligent misrepresentation, and fraud against Defendant Honeywell. [Doc. 1 at 7-9.] Continental argues that Honeywell's issuance of the Warranty induced Southwest and Higley to pay for Weather Mark's installation of the roof system and to continue construction of the LifeWorks facility, that Honeywell, through its inspector, made false and misleading statements regarding the pre-Warranty issue condition of the roof and that Southwest and Higley relied on these statements to their detriment, and that the Warranty was illusory and it was intended to induce and did induce Southwest and Higley to pay Honeywell.  [*See id.*] Honeywell, in its motion for summary judgment, says that Continental cannot satisfy the elements of any of these claims under Ohio tort law.  The Court agrees with Honeywell and grants summary judgment in Honeywell's favor on all three claims.

A threshold issue is Continental's right of recovery against Honeywell under Ohio law.[8/]  "By definition, a subrogee has only those rights its insured has." *Cmty. Ins. Co. v. Ohio Dep't of Transp.,* *739 N.E.2d 1166, 1170 (Ohio Ct. App. 2000).*  In light of the fact that Continental can only stand in the shoes of Higley, which, as noted above, does not have any contractual relationship with Honeywell, Continental can only recover from Honeywell if Honeywell owes Continental some duty separate and apart from the Warranty.

1. Promissory Estoppel

In claiming promissory estoppel, Plaintiff Continental alleges that Defendant Honeywell's issuance of the Warranty indicated approval of the roof installation and that this approval was

_____

[8/] Although the Warranty contains a New Jersey choice of law provision, the parties agree that Ohio law governs all non-contractual claims. [Doc. 18 at 9; Doc. 22 at 6.]

Case No. 1:08-CV-1410
Gwin, J.

intended to induce, and did induce, action on behalf of Southwest[2] and Higley. [Doc. 1 at 7-8.]

Promissory estoppel, under Ohio law, requires "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance." *McCroskey v. Ohio*, 456 N.E. 2d 1204, 1205 (Ohio 1983). The promise "is binding if injustice can be avoided only by enforcement of the promise." *Id.* Thus, a "plaintiff must establish the following four elements to prove a claim of promissory estoppel: (1) a clear and unambiguous promise; (2) reliance on the promise; (3) the reliance is reasonable and foreseeable; and (4) the party relying on the promise was injured by his or her reliance." *Dunn v. Bruzzese*, 874 N.E.2d 1221, 1227 (Ohio Ct. App. 2007) (citations omitted).

The question in this case is whether Defendant Honeywell, by issuing the Warranty, made a promise to Southwest or Higley that would tend to induce, and did induce, action on behalf of Higley. Plaintiff Continental argues that if Honeywell inspected the roof and issued the Warranty, the only reasonable conclusion is that Honeywell was satisfied that the roof was installed correctly. Southwest and Higley then relied on this reasonable belief in paying Weather Mark for the roof installation. According to Honeywell's Warranty application, however, "the issuance of a [Honeywell] [W]arranty shall not be deemed conclusive for design or construction of the building, including the roof system." [Doc. 18, Ex. E at 3.] The Warranty application also states that the issuance of the Honeywell Warranty "does not constitute assumption by [Honeywell] of any responsibility for specification, design[,] or construction of any portion of the building, including the

_____

[2] It is well-settled in Ohio that if an express contract exists between parties, neither party can seek recovery under a quasi-contractual theory of contracts such as promissory estoppel. *See Daup v. Tower Cellular, Inc.*, 737 N.E.2d 128, 138-39 (Ohio Ct. App. 2000). Because the Warranty governs the contractual relationship between Honeywell and Southwest, Southwest cannot have a quasi-contractual right of recovery in this case unless the Warranty is deemed to be void.

Case No. 1:08-CV-1410
Gwin, J.

roof system." [*Id.*] Further, the Warranty itself contemplates the possibility that the roof can be improperly installed despite Honeywell's inspection, stating that the Warranty is only valid when the roof system is installed in accordance with Honeywell's specifications and details. [Doc. 18, Ex. F at 2.] Thus, Honeywell did not intend to induce Southwest and Higley to rely on the issuance of the Warranty and, indeed, it specifically disclaimed the right of anyone to rely on the issuance of the Warranty as an indication that the roof was installed properly.

Perhaps more importantly, Southwest and Higley did not participate in the roof inspection process that was conducted solely for Honeywell's benefit. [Doc. 18, Ex. A at 22, 27.] Southwest and Higley also never received copies of the inspection results from Honeywell and, indeed, did not receive any documents from Honeywell prior to the completion of the roof installation. [Doc. 18, Ex. A at 5, 27.] Plaintiff Continental has also admitted that Southwest and Higley did not comply with certain requirements set out in the construction documents that involved monitoring Weather Mark during the roof installation process. For instance, Continental has admitted that Southwest, as the owner of the LifeWorks facility, "did not engage an independent testing and inspecting agency to perform field inspections and quality-assurance tests." [Doc. 18, Ex. B at 18.] This agency was "to provide reports stating whether the 'inspected and tested [w]ork complied with or deviates from requirements." [*Id.*]

Plaintiff Continental cannot demonstrate that Defendant Honeywell clearly and unambiguously promised that the roof was properly installed or that Continental's (or Southwest's and Higley's) arguable reliance on the issuance of the Warranty as constituting approval of the roof installation was reasonable and foreseeable. Continental thus fails to satisfy the elements of a promissory estoppel claim under Ohio law. The Court therefore grants summary judgment in favor

Case No. 1:08-CV-1410
Gwin, J.

of Honeywell on this claim.

### 2. Negligent Misrepresentation and Fraud

In bringing claims of negligent misrepresentation and fraud against Defendant Honeywell, Plaintiff Continental argues that Honeywell made false and misleading statements regarding the pre-Warranty issue condition of the roof through its inspector and that Continental relied on these statements to its detriment, [Doc. 1 at 9], and that the issuance of the (illusory) Warranty was intended to induce and did induce Southwest and Higley's payment of Honeywell's invoices, [*id.*]

The tort of negligent misrepresentation and the tort of fraud have two elements in common: an affirmative misrepresentation, whether negligent or intentional, and justifiable reliance on this misrepresentation. *See Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989) (citations omitted) (holding that an individual commits the tort of negligent misrepresentation if he "in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions" while failing to "exercise reasonable care or competence in obtaining or communicating the information" and those receiving the false information justifiably rely on this information and suffer pecuniary loss); *Burr v. Bd. of Cty. Comm'rs*, 491 N.E.2d 1101, 1005 (Ohio 1986) (concluding that a fraudulent statement is "a representation or, where there is a duty to disclose, concealment of a fact" that is "material to the transaction at hand, . . . made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, . . . [or] with the intent of misleading another into relying upon it" and that there must be "justifiable reliance upon the representation or concealment, and a resulting injury proximately caused by the reliance").

-23-

Case No. 1:08-CV-1410
Gwin, J.

In this case, the misrepresentation at issue is Defendant Honeywell's issuance of the Warranty following its inspection of the roof system.  As noted above, neither Southwest nor Higley received any information, including copies of the roof inspection, from Honeywell prior to the completion of the roof installation.  The only information Higley ever received from Honeywell was a sample Warranty, along with documents listing Honeywell's roof system installation specifications and details relating to the installation of its roof system. [Doc. 22, Ex. 51 at 10.] Further, the Warranty specifically disclaims any representations other than those made in the text of the Warranty, [Doc. 18, Ex. F at 2], and states that Honeywell's "exclusive responsibility and liability under the [W]arranty is to make repairs that may be necessary to maintain the roofing system in a watertight condition," [id.] The Warranty application also disclaims the right of anyone to rely on the issuance of the Warranty as approval of the roof installation.  [Doc. 18, Ex. E at 3.]  Because Plaintiff Continental is unable to demonstrate that Defendant Honeywell made any affirmative misrepresentations by issuing the Warranty or that Continental was justified in relying on the issuance of the Warranty as approving the roof installation, the Court grants summary judgment in favor of Honeywell on Continental's negligent misrepresentation and fraud claims.

### III. Conclusion

For the above reasons, the Court **GRANTS** Defendant Honeywell's motion for summary judgment.

IT IS SO ORDERED.


Dated: February 6, 2009                              s/         *James S. Gwin*
                                                     JAMES S. GWIN
                                                     UNITED STATES DISTRICT JUDGE